# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN C. SWANSON, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>BAYER CROPSCIENCE LP, BAYER CROPSCIENCE, INC., CORTEVA INC., CARGILL INCORPORATED, BASF CORPORATION, SYNGENTA CORPORATION, WINFIELD SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC., FEDERATED CO-OPERATIVES LTD., CHS INC., NUTRIEN AG SOLUTIONS INC., GROWMARK INC., GROWMARK FS, LLC, SIMPLOT AB RETAIL SUB, INC., AND TENKOZ INC.,<br><br>     Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

JURISDICTION AND VENUE ......................................................................................3

PARTIES .......................................................................................................................4

    A.    Plaintiff ...........................................................................................................4

    B.    The Manufacturer Defendants .....................................................................4

    C.    The Wholesaler Defendants .........................................................................5

    D.    The Retailer Defendants ...............................................................................6

SUBSTANTIVE ALLEGATIONS .................................................................................8

TRADE AND COMMERCE ........................................................................................16

RELEVANT MARKETS ..............................................................................................16

ANTITRUST IMPACT .................................................................................................17

ANTITRUST INJURY ..................................................................................................17

CLASS ACTION ALLEGATIONS ..............................................................................17

STANDING TO SEEK RELIEF ...................................................................................19

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ........................20

CLAIMS FOR RELIEF ...............................................................................................21

PRAYER FOR RELIEF ...............................................................................................42

DEMAND FOR JURY TRIAL ....................................................................................43

## INTRODUCTION

1.      Plaintiff brings this action to redress Defendants' coordinated unlawful actions that forced American farmers to pay artificially high prices for "Crop Inputs"—seeds and crop protection chemicals such as fungicides, herbicides, and insecticides—manufactured by a Defendant, and purchased from either a Defendant or another retailer.

2.      Defendants established an opaque distribution process that prevented farmers from effectively comparison shopping, by withholding and deliberately obfuscating product information, and maintaining strict secrecy with respect to wholesale prices.

3.      Around 2016, several electronic platforms launched with the goal of offering relatively cheap and transparent means for farmers to purchase Crop Inputs. Defendants conspired to boycott them and ultimately forced them to change their business models. In so doing, Defendants deprived farmers of the opportunity to purchase Crop Inputs at transparent, competitive prices.

4.      Defendants' conduct is currently the subject of an investigation by Canada's Commissioner of Competition, which the United States Justice Department is monitoring to determine whether to launch its own investigation.

5.      The domestic market for Crop Inputs encompasses annual sales over $65 billion. The market is dominated by four manufacturers: Defendants Bayer CropScience Inc.; Corteva Inc.; Syngenta Corporation and BASF Corporation (collectively, the "Manufacturer Defendants"), whose collective market shares accounts for 75 percent of all agrochemicals globally, as well as over 75 percent of the domestic seed market for each of the leading crops.

6.      Their products are distributed primarily through large wholesalers: Defendants Cargill Incorporated; Winfield Solutions, LLC; Univar Solutions, Inc. (the "Wholesaler

Defendants"), which collectively dominate the sale of Crop Inputs to farmers and retailers, including Defendants CHS Inc., Nutrien Ag Solutions Inc., GROWMARK Inc., GROWMARK FS, LCC, Simplot AB Retail Sub, Inc., Tenkoz Inc., and Federated Co-operatives Limited (the "Retailer Defendants").

7.     To ensure their boycott was successful, Defendants enforced strict discipline on retailers who failed to comply. For example, in 2018, after learning that some retailers had sold product to Farmers Business Network ("FBN") despite the boycott, Defendant Syngenta initiated an audit of its authorized retailers to identify and punish the retailers who had made those sales. Similarly, Defendants Bayer, BASF, and Corteva inserted mandatory language in their form contracts with authorized retailers that allows them to audit authorized retailers' books and records and perform on-site inspections at any time. Bayer, BASF, and Corteva used these provisions to ensure that electronic platforms could not secure their Crop Inputs by buying from an authorized retailer.

8.     Such Crop Input electronic platforms were geared toward providing purchasers with a cheaper, transparent method to buy Crop Inputs, by selling products acquired from the Manufacturer Defendants directly to farmers. FBN's electronic sales platform and a similar platform operated by AgVend, Inc. were initially popular with farmers and poised to grow, having successfully raised millions of dollars from investors to expand capacity and meet demand.

9.     In furtherance of the boycott, however, the Manufacturer and Wholesaler Defendants repeatedly blocked FBN's access to Crop Inputs by agreeing among themselves not to sell products to FBN, even though doing so would have created a lucrative stream of new sales

for any individual wholesaler or manufacturer acting independently and in their economic self-interest.

10.     Defendants' boycott was successful in the case of both FBN and AgVend. FBN, foreclosed from selling Defendants' Crop Inputs, has begun developing its own products to sell to farmers. Unable to purchase from Defendants, AgVend shut down its platform in favor of establishing web-based storefronts for traditional brick-and-mortar retailers.

11.     Defendants' boycott has resulted in the maintenance of supracompetitive Crop Input prices by denying farmers accurate product information, including pricing information, that would enable them to make well-informed purchasing decisions. As a direct proximate result of Defendants' ongoing unlawful conduct, farmers in the United States continue to be locked into accepting supracompetitive price increases for Crop Inputs that outpace any increases in their yield, and otherwise inure to their detriment and injury.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26. This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and members of the Class are citizens of different states than Defendants.

13.     Venue is proper in this District pursuant to Sections 4, 12, & 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c), and (d). One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

## PARTIES

### A.   Plaintiff

14.    John C. Swanson is a citizen of the state of New York. Mr. Swanson purchased sorghum sudangrass seed at supracompetitive prices from Defendant GROWMARK FS, LLC during the relevant period.

### B.   The Manufacturer Defendants

15.    Bayer AG is a multinational pharmaceutical, chemical, and agriculture company. It organizes itself into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

16.    Defendant Bayer CropScience Inc. is a wholly-owned subsidiary of Bayer AG headquartered in St. Louis, Missouri and incorporated in New York that develops, manufactures, and sells Crop Inputs in the United States.

17.    Defendant Bayer CropScience LP is a wholly-owned subsidiary of Bayer AG headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

18.    Bayer CropScience Inc. and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division.

19.    Defendant Corteva Inc. is a domestic corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

20.    Defendant BASF Corporation is headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational

pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States.

21.     Defendant Syngenta Corporation is the main U.S.-based operating subsidiary of Syngenta AG, and is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

22.     Defendant Cargill, Inc. is a domestic corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler AgResource Division, which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

**C.     The Wholesaler Defendants**

23.     Defendant Cargill, Inc. is a domestic corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler AgResource Division, which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

24.     Defendant Winfield Solutions, LLC ("Winfield United") is a domestic corporation headquartered in Arden Hills, Minnesota and incorporated in Delaware. Winfield United is a Crop Input wholesaler. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield United is also a major Crop Input retailer that operates as a cooperative owned by its members, which are 650 Crop Input retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

25.     Defendant Univar Solutions, Inc. is a Crop Input wholesaler. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Univar Solutions, Inc. is a domestic corporation headquartered in Illinois and incorporated in Delaware.

**D.     The Retailer Defendants**

26.     Defendant CHS Inc. is one of the largest crop input wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick and mortar stores. CHS Inc. is incorporated and headquartered in the state of Minnesota.

27.     CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

28.     Defendant Nutrien Ag Solutions, Inc. is both a Crop Input wholesaler and the largest Crop Input retailer in the United States. It sells Crop Inputs to farmers throughout the country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien Ag Solutions, Inc. is incorporated in Delaware and has its principal place of business in Colorado.

29.     Defendant GROWMARK, Inc. d/b/a Farm Supply or FS ("Growmark"), is a large Crop Input retailer headquartered in Illinois, with brick and mortar locations throughout the Midwestern United States. Growmark is incorporated in Delaware. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs, and entitling it to special rebates.

30.     Defendant GROWMARK FS, LLC, is a large Crop Input retailer headquartered in Delaware, with brick and mortar locations throughout the Mid-Atlantic United States. GROWMARK FS, LLC is incorporated in Delaware. GROWMARK FS, LLC maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs, and entitling it to special rebates.

31.     Defendant Tenkoz Inc. is one of the largest Crop Input retailers in the United States. Tenkoz purchases and sells 25 percent of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

32.     Defendant Simplot AB Retail Sub, Inc. f/k/a Pinnacle Agriculture Distribution, Inc. is a large Crop Input wholesaler and retailer that operates 135 retail locations across 27 states. Simplot is headquartered and incorporated in Mississippi. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

33.     Defendant Federated Co-operatives Ltd. is a large Crop Input retailer. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the Crop Input market.

## SUBSTANTIVE ALLEGATIONS

34.     United States farmers are increasingly unable to maintain financial stability, with operating expenses skyrocketing while yields remain stagnant. For example, between 1995 and 2011, the cost of growing soybeans and corn substantially tripled, but yields for those same crops rose by only 19 and 30 percent, respectively.

35.     One study observed that fertilizer, pesticide, and seed costs constituted 32 percent of crop revenue on average between 1990 and 2006, and 36 percent of crop revenue on average between 1990 and 2006. That figure had risen to 48 percent by 2016. The study's authors concluded that "[f]armers need to take proactive actions to reduce rates and amounts of inputs applied. Even with aggressive input usage cuts, it will be difficult for cash flow losses to be reduced without input price decreases."[1] *See also infra* Table 1.[2]

---

[1] https://farmdocdaily.illinois.edu/2016/07/growth-rates-of-fertilizer-pesticide-seed-costs.html
(Last visited January 12, 2021).

[2] *Id.*

8

### Table 1.  Fertilizer, Pesticide, and Seed Costs, Yields and Prices on High-Productivity Farms in Central Illinois

| Year | Fertilizers Costs | Pesticides Costs | Seed Costs | Actual Yield | Corn Price |
|------|------|------|------|------|------|
|      | $/acre | $/acre | $/acre | bu/acre | $/bu |
| 1990 | 53 | 22 | 23 | 149 | 2.39 |
| 1991 | 55 | 24 | 23 | 131 | 2.38 |
| 1992 | 52 | 24 | 24 | 176 | 2.38 |
| 1993 | 51 | 26 | 24 | 151 | 2.2 |
| 1994 | 53 | 28 | 26 | 182 | 2.49 |
| 1995 | 62 | 29 | 27 | 128 | 2.37 |
| 1996 | 61 | 33 | 28 | 161 | 3.33 |
| 1997 | 62 | 34 | 31 | 148 | 2.8 |
| 1998 | 62 | 33 | 33 | 152 | 2.48 |
| 1999 | 53 | 31 | 34 | 166 | 2.09 |
| 2000 | 53 | 32 | 33 | 165 | 1.97 |
| 2001 | 57 | 33 | 34 | 168 | 2.06 |
| 2002 | 55 | 34 | 34 | 152 | 2.37 |
| 2003 | 57 | 38 | 36 | 186 | 2.41 |
| 2004 | 68 | 38 | 38 | 190 | 2.17 |
| 2005 | 78 | 43 | 43 | 172 | 2.11 |
| 2006 | 82 | 40 | 45 | 180 | 2.99 |
| 2007 | 90 | 40 | 55 | 201 | 4.12 |
| 2008 | 124 | 46 | 67 | 199 | 4.07 |
| 2009 | 185 | 52 | 90 | 192 | 3.62 |
| 2010 | 122 | 44 | 95 | 168 | 5.07 |
| 2011 | 159 | 50 | 96 | 174 | 6.24 |
| 2012 | 200 | 49 | 108 | 126 | 6.93 |
| 2013 | 193 | 66 | 114 | 197 | 4.52 |
| 2014 | 171 | 67 | 120 | 231 | 3.76 |
| 2015 | 166 | 66 | 118 | 200 | 3.77 |

Source:  Recent data are from called Revenue and Costs for Corn, Soybeans, Wheat, and Double-Crop Soybeans.  Costs and yields are summaries of farms enrolled in Illinois Farm Business Farm Management.

36.     These cost increases are not attributable to any legitimate cause. Manufacturers'
research and development expenditures have decreased considerably in recent years. Rather, they

9

are the result of massive and baseless disparities in the prices farmers pay for Crop Inputs, which can vary by as much as 60 percent within a geographic region, and the supracompetitive prices paid by farmers as a result of Defendants' boycott of electronic distribution platforms that facilitated transparent and competitive pricing.

37.     For example, a nationwide survey of farmers reflected that the price per gallon farmers paid for Bayer AG's popular herbicide Roundup PowerMAX varied by as much as 270 percent for farmers buying identical products. The same is true of seeds, with some farmers paying over $20 more per acre than other farmers pay for the same seeds.

38.     These price disparities persist by Defendants' design. The Crop Input market is fraught with secrecy, to maximize opacity and preclude farmers from making informed decisions about the Crop Inputs they are required to purchase. Farmers are forced to pay more for Crop Inputs than they would in a competitive market, in large part because they lack the objective information and data necessary to assess their purchases, and are unable to purchase Crop Inputs without paying for the unnecessary overhead of brick-and-mortar retailers.

39.     This secrecy begins at the top of the Crop Input market, where the Manufacturer Defendants who produce between 75 and 90 percent of the largest-selling Crop Inputs closely guard their product prices.

40.     In addition, the Manufacturer Defendants allow only wholesalers (including the Wholesaler Defendants), retailers the manufacturers own or operate, and certain "authorized retailers" such as the Retailer Defendants to sell the Manufacturer Defendants' Crop Inputs.

41.     The contracts granting "authorized retailer" licenses contain strict confidentiality provisions that preclude authorized retailers from disclosing the manufacturers' prices, or any incentives, rebates, and commissions the manufacturers offer to their authorized retailers. Those

contracts also require confidential "zone pricing," under which identical products are priced differently dependent strictly on the customers' locations. Zone pricing is a historical practice (first introduced by Defendant Bayer in the 1990s) that has no pro-competitive justification.

42.     Manufacturers also use a tactic known as "seed relabeling" to perpetuate farmers' inability to rely on objective performance data. Seed relabeling entails renaming and repackaging seeds that have long been on the market so that they can be sold at a higher price.

43.     Retail pricing is likewise opaque. Wholesalers' contracts with authorized retailers also contain strict confidentiality provisions. Retailers cannot disclose either their wholesale prices *or* the prices available to other farmers. Retailers further obfuscate prices by selling Crop Inputs and related services (e.g., spraying or applying chemicals) in bundles, making it difficult—if not impossible—for farmers to discern the price they are paying for any Crop Input or service.

44.     Electronic Crop Input sales platforms recognized the opportunity presented by such an opaque market,  and began emerging by 2016 with the goal of modernizing it by, among other things, providing farmers with transparent pricing and access to Crop Inputs direct from the Manufacturer Defendants, bypassing the opaque and inefficient distribution system controlled by the Wholesaler and Retailer Defendants.

45.     Those efforts were initially successful, as farmers took advantage of the electronic platforms' pricing and transparency. Over 12,000 farmers registered for access to FBN's objective performance data, while 6,000 farmers registered for FBN's electronic sales platform.

46.     The Wholesaler and Retailer Defendants recognized that the electronic platforms threatened their places in the Crop Input market and their profit margins. A report published by CoBank, a cooperative partly owned by Crop Input retailers and a major lender to grain

cooperatives, explained the threats: "Despite relatively low sales, e-commerce companies pose a threat to brick-and-mortar ag retailers in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices." Even farmers who did not purchase using the electronic platforms might use their prices to negotiate lower prices from established retailers.

47.     Upon learning about FBN's entry into the market in 2016, CHS distributed a letter to farmers to discourage them from using FBN, falsely claiming that, while an electronic platform like FBN would be able to offer the same products at lower prices, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."

48.     CropLife America is a trade association that whose members are major Crop Input manufacturers, wholesalers, and retailers. Its Board of Directors is at all times chaired by an executive from one of the Manufacturer Defendants. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, CHS, Growmark, Tenkoz, and Simplot. Although CropLife America's long-time CEO claims that "the work of our Board of Directors is imperative to making sure that farmers have access to crop protection technology today and in the future," there is not a single farmer representative on CropLife America's Board of Directors. That exclusion makes an ideal vehicle for collusion at farmers' expense.

49.     CropLife America publishes CropLife Magazine, which repeated CoBank's concerns, and warned repeatedly about the danger electronic platforms posed to Crop Input retailers' business model. CropLife was "concerned that the retailer could be disintermediated—i.e., that electronic platforms would 'cut out the middle man'—allowing growers to find product conveniently and at a lower market price," and decried "the devil known as 'price

transparency,'" adding that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

50.     CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts"—clearly identified the threat posed by electronic platforms to retailers and wholesalers at its 2017 annual meeting. CropLife's coverage of the event reported that "three letters . . . continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how FBN had negatively affected their businesses during 2017 by cutting into their already slim margins on various products."

51.     The Retailer Defendants and the Wholesaler Defendants knew that retention of their market positions and profit margins depended on the exclusion of electronic platforms from the market, so they conspired to cut off the platforms' product supply. To that end, the Retailer and Wholesaler Defendants pressured the Manufacturer Defendants, which rely on the Retailer and Wholesaler Defendants to recommend and sell their products to farmers, to cut off FBN's supply of Crop Inputs.

52.     Bayer secretly formed an internal task force in 2016 specifically to study the long-term competitive impact of FBN's electronic platform.

53.     The Manufacturer Defendants generally complied with the Retailer and Wholesaler Defendants' demand, and instituted a group boycott of electronic platforms, including FBN. When FBN subsequently sought to purchase Crop Inputs from the Manufacturer

and Wholesaler Defendants, they all refused, and offered only pretextual excuses for doing so. For example, after learning that a small volume of Crop Inputs had been sold on electronic platforms in violation of Defendants' boycott, Syngenta's Head of Crop Protection Sales in the United States falsely claimed that electronic platforms delivered counterfeit products and that, "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

54.     To ensure the boycott's success, Defendants imposed strict penalties on retailers who violated it. For example, in 2018, after learning that certain retailers had sold Crop Inputs to FBN, Syngenta initiated an audit of all of its authorized retailers to identify and punish the ones who had made those sales.

55.     Bayer, BASF, and Corteva also include mandatory language in their form contracts with authorized retailers that allows them to audit authorized retailers' books and records and perform on-site inspections at any time. Bayer, BASF, and Corteva used these provisions to ensure that electronic platforms could not purchase branded Crop Inputs from an authorized retailer.

56.     The effects of the boycott even extended to generic products (*i.e.*, Crop Inputs sold by non-Defendant manufacturers after their patents expire). In a recent Forbes article, one CEO of a generic chemical products company admitted he was hesitant to supply FBN because he was "wary of angering their existing sales channels [i.e., wholesalers and retailers]." That CEO added that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."

57.     FBN attempted to circumvent the boycott by purchasing Yorkton, a Canada-based retailer with decades-old supply agreements with Defendants Bayer, Syngenta, BASF, Corteva,

14

and Winfield United. Those agreements should have provided FBN with Crop Input inventory to sell to American farmers. But the Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants if they maintained the agreements. Faced with those threats, the Manufacturer Defendants agreed to boycott Yorkton and abruptly canceled their long-standing supply contracts within a few months of its March 2018 acquisition by FBN.

58.     The boycott was successful. FBN is now developing its own products to sell to farmers via its electronic platform.

59.     Defendants' also refused to supply AgVend. AgVend ultimately shut down its platform and now installs web-based storefronts for traditional brick-and-mortar retailers, essentially migrating the existing broken market structure online.

60.     As a result of the Retailer, Wholesaler, and Manufacturer Defendants' coordinated actions, farmers were deprived of the opportunity to purchase Crop Inputs at transparent, competitive prices from electronic platforms. They have been forced to continue paying supracompetitive prices for Crop Inputs purchased from inefficient brick-and-mortar retailers, subject to Defendants' confidentiality requirements.

61.     The collapse of FBN and AgVend drew the attention of Canada's Competition Bureau ("CCB"), which is formally investigating Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC in the seed and crop protection markets. The CCB is investigating whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

15

62.     In the course of that investigation, on February 11, 2020, a Canadian federal court granted in full *ex parte* applications made by Canada's Commissioner of Competition for the production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Bayer CropScience Inc. and its wholly-owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices.

63.     Over Defendants' objections, the Canadian federal court found sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well. The United States Department of Justice is monitoring the Competition Bureau's investigation and is deciding whether to launch its own investigation into Defendants' concerted refusal to supply electronic platforms with Crop Inputs.

## TRADE AND COMMERCE

64.     Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce.

65.     During the Class Period, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## RELEVANT MARKETS

66.     This action involves the markets for Crop Inputs, including the manufacture of Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

67.     The relevant geographic market is the United States.

## ANTITRUST IMPACT

68.     Defendants' conduct has substantially impaired competition in the retail market for Crop Inputs by excluding electronic platforms, including FBN and AgVend, from competing in that market.

69.     Defendants' conduct in boycotting and preventing electronic platforms from competing in the retail sales market for Crop Inputs lacks any procompetitive justification. Moreover, the harm to competition and the resulting antitrust injury—suffered by both farmers and other consumers of Crop Inputs—more than offsets any procompetitive justifications Defendants may offer.

## ANTITRUST INJURY

70.     Plaintiff and Class Members have suffered antitrust injury as a direct result of Defendants' unlawful conduct.

71.     By impairing competition in the retail sales market for Crop Inputs, and by excluding electronic platforms from competing in that market, Defendants have artificially raised the prices paid by farmers for Crop Inputs, and ultimately the prices paid by consumers for farm products including corn and grain.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action on behalf of himself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

   a.   All persons or entities residing in the United States that, during the Class Period, purchased from a Defendant a Crop Input manufactured by a Manufacturer Defendant; and

   b.   All persons or entities residing in the United States that, during the Class Period, purchased from a retailer other than a Retailer Defendant a Crop Input manufactured by a Manufacturer Defendant.

17

73.     Excluded from the Classes are Defendants; their officers, directors, management, employees, subsidiaries, affiliates, and coconspirators; and any persons or entities that purchased Crop Inputs solely for resale to others. Also excluded are the judge presiding over this action; her law clerks and spouse; any persons within three degrees of relationship to those living in the Judge's household; and the spouses of all such persons.

74.     Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in Defendants' possession.

75.     Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes were damaged by the same wrongful conduct of Defendants.

76.     Plaintiff will fairly and adequately protect and represent the interests of members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of members of the Classes.

77.     Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions involving group boycotts and conspiracy claims.

78.     Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

   a.   whether Defendants conspired to unreasonably restrain trade in violation of
        federal antitrust laws;

   b.   the duration of the alleged conspiracy;

18

     c.   whether Crop Input retailers conspired amongst themselves and/or joined the conspiracy to unreasonably restrain trade in violation of antitrust laws;

     d.   injury suffered by Plaintiff and members of the Classes;

     e.   damages suffered by Plaintiff and members of the Classes; and

     f.   whether Defendants have acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

79.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

80.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

81.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

82.    Plaintiff has defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Classes, including, without limitation, the Class Period.

**STANDING TO SEEK RELIEF**

83.    The members of the Classes have purchased directly from a participant in the conspiracy in restraint of trade between the Manufacturer and Wholesaler Defendants and their

Retailer Defendant co-conspirators, or from an authorized retailer that is in the control of the Manufacturer and Wholesaler Defendants by virtue of the terms of the authorized-retailer licenses dictated by the Manufacturer Defendants. As a consequence, the members of the Classes have standing to pursue damages inflicted by the conspiracies under Article III of the United States Constitution and Section 4(a) of the Clayton Act, 15 U.S.C. §15(a).

84.     By engaging in the conspiracy alleged in this Complaint, the Manufacturer Defendants, Wholesaler Defendants, and Retailer Defendants have kept a market structure in place that benefits each of them at the expense of farmers. As the first purchasers injured by the Defendants' anticompetitive conduct, Plaintiff and the members of the Classes have standing as direct purchasers under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

85.     The members of the Classes also have standing to seek injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, because the conspiracies have inflicted or threatened to inflict harm on them, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Classes as a whole.

86.     The members of the Classes also have standing to seek declaratory relief under 28 U.S.C. §§ 2201 and 2202 because there is an actual, present, and justiciable controversy that has arisen between members of the Classes and all Defendants concerning whether Defendants and other co-conspirators have conspired in restraint of trade.

### EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

87.     Any applicable statute of limitations for Plaintiff and the Classes has been tolled and/or Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' and their co-conspirators concealment of the conspiracy.

88.     Group boycotts and other antitrust violations are inherently self-concealing, and Plaintiff and the Classes could not have uncovered the conspiracy earlier using reasonable diligence.

89.     Plaintiff and the Classes were not placed on notice of the conspiracy alleged herein until the Canadian Competition Bureau launched its inquiry and issued its subpoenas.

## CLAIMS FOR RELIEF

### Count 1: Conspiracy to Restrain Trade
### in Violation of § 1 of the Sherman Act (15 U.S.C. § 1)

90.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

91.     During the Class Period, Defendants entered into and engaged in a horizontal combination or conspiracy in restraint of trade to (1) artificially raise, fix, maintain, and/or stabilize prices for Crop Inputs that Defendants sold to Plaintiff and members of the Classes, and (2) jointly boycott entities that would have introduced price-reducing electronic purchasing of Crop Inputs in the United States.

92.     Defendants' actions were not mere parallel conduct but took place in the context of multiple plus factors that typically evince a conspiratorial agreement.

93.     First, the conspiracy is feasible because the market for Crop Inputs is highly concentrated. BASF, Corteva Inc., Syngenta Corporation, and Bayer AG dominate production in virtually every Crop Input category because they hold the patents for the genetic traits and crop protection chemicals that work best with popular branded seeds. As a result, they control 85 percent of the corn seed market, more than 75 percent of the soybean seed market, and over 90 percent of the cotton seed market. The wholesale market is just as concentrated, with seven wholesalers accounting for 70 percent of all sales volume.

21

94.     Second, such an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation between Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

95.     Third, Defendants had a strong motive to conspire to preserve the present, opaque market structure. If electronic platforms publicly published price lists for specific Crop Inputs, then the Manufacturer, Wholesaler, and Retailer Defendants could no longer keep prices confidential and charge widely varying prices for the same Crop Input based on geography, and/or maintain price opacity through seed relabeling and bundling. The Retailer Defendants and Wholesaler Defendants were therefore motivated to conspire amongst themselves and exert pressure on the Manufacturer Defendants to protect their profits without having to compete on the merits of price and services.

96.     Fourth, Defendants formed and maintained their conspiracy using a high degree of inter-firm communication both directly and through wholesalers and retailers. For example, CropLife's Board of Directors meets annually to discuss developments in the Crop Input market and has specifically discussed the entry of electronic platforms. Because no representatives from farmers are allowed to participate, these meetings provided a forum for collusion.

97.     As noted above, CropLife's PACE Advisory Council meets annually to discuss issues affecting the Crop Input market. And the Agricultural Retailers Association ("ARA") hosts an annual in-person industry conference every year, which is attended by representatives from all major Crop Input retailers, as well as representatives from each Defendant. These

22

industry conferences provided ample opportunity for Defendants to not only agree amongst themselves how to block electronic platforms from emerging, but also to coordinate with the other levels of the distribution chain—in fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting.

98.     Fifth, Defendants' actions were against their apparent economic self-interest. Providing Crop Inputs to electronic platforms presented a significant business opportunity because those platforms (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profit by eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

99.     Sixth, Defendants are antitrust recidivists, which is probative of future collusion. *See*, *e.g.*, *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2004). Competition experts have noted that past experience with participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists." BASF and Bayer are among the top 5 leading antitrust recidivists, and Corteva is also on the list.

100.     This conspiracy was a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

101.     Alternatively, this conspiracy was a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or pro-

competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pretextual, outweighed by the anticompetitive effects of Defendants' conduct, and, in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

102.    Plaintiff and members of the Classes directly purchased Crop Inputs from Defendants and their co-conspirators at supracompetitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

103.    Plaintiff and members of the Classes have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

104.    Plaintiff and members of the Classes are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**Count 2: Arizona Uniform State Antitrust Act**

105.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

106.    Defendants' acts and practices detailed above violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 44-1402, and monopolization or attempted monopolization of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 44-1403.

24

107.    Defendants' conduct and practices have substantial anticompetitive effects in Arizona, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

108.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Arizona Uniform State Antitrust Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 3: California Cartwright Act

109.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

110.    Defendants' acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

111.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

112.    Defendants' conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service and lowered output.

113.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent when he paid more for Crop Inputs than he would have

paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 4: Florida Deceptive and Unfair Trade Practices Act

114.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

115.    Defendants' acts and practices detailed above violate Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.

116.    Defendants' conduct and practices have substantial anticompetitive effects in Florida, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

117.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Florida's laws governing deceptive and unfair trade practices were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 5: Hawaii Antitrust Laws

118.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

119.    Defendants' acts and practices detailed above violate Hawaii's antitrust laws, Haw. Rev. Stat. § 480-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 480-4, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 480-9.

26

120.    Defendants' conduct and practices have substantial anticompetitive effects in Hawaii, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

121.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Hawaii's antitrust laws were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 6: Illinois Antitrust Act

122.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

123.    Defendants' acts and practices detailed above violate the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, which prohibits, *inter alia*, combinations and conspiracies for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity, *id.* 10/3(1)(a), and monopolization or attempted monopolization over any substantial part of trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce, *id.* 10/3(3).

124.    Defendants' conduct and practices have substantial anti-competitive effects in Illinois, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

125.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the Illinois Antitrust Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continues to suffer damages

and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 7: Iowa Competition Law

126.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

127.    Defendants' acts and practices detailed above violate the Iowa Competition Law, Iowa Code § 553.1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce, *id.* § 553.4, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 553.5.

128.    Defendants' conduct and practices have substantial anticompetitive effects in Iowa, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

129.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Iowa Competition Law was intended to prevent when he paid more for Crop Inputs than they would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 8: Kansas Restraint of Trade Act

130.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

131.    Defendants' acts and practices detailed above violate the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, *et seq.*, which prohibits, *inter alia*, combinations to create or

carry out restrictions in trade or commerce, increase the price of merchandise, or prevent competition in the sale of merchandise, *id.*

132.     Defendants' conduct and practices have substantial anticompetitive effects in Kansas, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

133.     Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Kansas Restraint of Trade Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 9: Maine Monopoly & Profiteering Laws

134.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

135.     Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

136.     Defendants' acts and practices detailed above violate Maine's monopoly and profiteering laws, Me. Rev. Stat. tit. 10, § 1101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 1102.

137.     Defendants' conduct and practices have substantial anticompetitive effects in Maine, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

138.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Maine's monopoly and profiteering laws were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 10: Maryland Antitrust Laws

139.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

140.    Defendants' acts and practices detailed above violate Maryland's antitrust laws, Md. Code, Com. Law § 11-201, *et seq.*, which prohibit, *inter alia*, combinations that unreasonably restrain trade or commerce, *id.* § 11-204, and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce, *id.*

141.    Defendants' conduct and practices have substantial anticompetitive effects in Maryland, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

142.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Maryland antitrust laws were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

30

### Count 11: Massachusetts Consumer Protection Laws

143.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

144.    Defendants' acts and practices detailed above violate Massachusetts' consumer protection laws, Mass. Gen. Laws ch. 93A, § 1, *et seq.*, which prohibit, *inter alia*, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, *id.* § 2.

145.    Defendants' conduct and practices have substantial anticompetitive effects in Massachusetts, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

146.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Massachusetts consumer protection laws were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 12: Michigan Antitrust Reform Act

147.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

148.    Defendants' acts and practices detailed above violate the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 445.772, and the establishment or attempted establishment of a monopoly of trade or commerce for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, *id.* § 445.773.

31

149.    Defendants' conduct and practices have substantial anticompetitive effects in Michigan, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

150.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Michigan Antitrust Reform Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 13: Minnesota Antitrust Law of 1971

151.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

152.    Defendants' acts and practices detailed above violate the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, which prohibits, *inter alia*, combinations in unreasonable restraint of trade or commerce, *id.* § 325D.51, and the establishment or attempted establishment of a monopoly over any part of trade or commerce for the purpose of affecting competition or controlling, fixing, or maintaining prices, *id.* § 325D.52.

153.    Defendants' conduct and practices have substantial anticompetitive effects in Minnesota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

154.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Minnesota Antitrust Law of 1971 was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer

damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 14: Mississippi Antitrust Laws

155.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

156.    Defendants' acts and practices detailed above violate Mississippi's antitrust laws, Miss. Code. § 75-21-1, *et seq.*, which prohibit, *inter alia*, combinations inimical to the public welfare that restrain trade, increase the price of a commodity, or reduce the production of a commodity, *id.*

157.    Defendants' conduct and practices have substantial anticompetitive effects in Mississippi, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

158.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Mississippi's antitrust laws were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 15: Nebraska Junkin Act

159.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

160.    Defendants' acts and practices detailed above violate the Junkin Act, Neb. Rev. Stat. § 59-802, *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more

persons to restrain trade or commerce, *id.* § 59-802, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 16726.

161.    Defendants' conduct and practices have substantial anticompetitive effects in Nebraska, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

162.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Nebraska's Junkin Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 16: Nevada Unfair Trade Practices Act

163.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

164.    Defendants' acts and practices detailed above violate the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 598A.060, and tying arrangements, consisting of contracts in which the seller or lessor conditions the sale or lease of commodities or services on the purchase or leasing of another commodity or service, *id.*

165.    Defendants' conduct and practices have substantial anticompetitive effects in Nevada, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

166.  Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that Nevada's Unfair Trade Practices Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 17: New Hampshire Consumer Protection Act

167.  Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

168.  Defendants' acts and practices detailed above violate the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, which prohibits, *inter alia*, the pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, *id.* § 358-A:2.

169.  Defendants' conduct and practices have substantial anticompetitive effects in New Hampshire, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

170.  Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the New Hampshire Consumer Protection Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 18: New Mexico Antitrust Act

171.  Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

172.    Defendants' acts and practices detailed above violate the New Mexico Antitrust Act, N.M. Stat. § 57-1-1, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 57-1-2, and combinations in restraint of trade or commerce, *id.* § 57-1-1.

173.    Defendants' conduct and practices have substantial anticompetitive effects in New Mexico, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

174.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the New Mexico Antitrust Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 19: New York Donnelly Act

175.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

176.    Defendants' acts and practices detailed above violate New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*, which prohibits, *inter alia*, monopoly in the conduct of any business, trade or commerce or in the furnishing of any service, *id.* § 340.

177.    Defendants' conduct and practices have substantial anticompetitive effects in New York, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

178.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that New York's Donnelly Act was intended to prevent when he paid more for Crop Inputs than he

would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 20: North Carolina Antitrust Laws

179.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

180.    Defendants' acts and practices detailed above violate North Carolina's antitrust laws, N.C. Gen. Stat. § 75-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 75-1, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 75-2.1.

181.    Defendants' conduct and practices have substantial anticompetitive effects in North Carolina, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

182.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the North Carolina antitrust laws were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 21: North Dakota Uniform State Antitrust Act

183.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

184.    Defendants' acts and practices detailed above violate the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*, which prohibits, *inter alia*,

37

combinations in restraint of, or to monopolize, trade or commerce, *id.* § 51-08.1-02, and the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, *id.* § 51-08.1-03.

185.    Defendants' conduct and practices have substantial anticompetitive effects in North Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

186.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the North Dakota Uniform State Antitrust Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## Count 22: Oregon Antitrust Law

187.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

188.    Defendants' acts and practices detailed above violate the Oregon Antitrust Law, Or. Rev. Stat. § 646.705, *et seq.*, which prohibits, *inter alia*, combinations in restraint of trade or commerce, *id.* § 646.725, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 646.730.

189.    Defendants' conduct and practices have substantial anticompetitive effects in Oregon, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

190.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the Oregon Antitrust Law was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 23: South Dakota Antitrust Laws

191.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

192.    Defendants' acts and practices detailed above violate South Dakota's antitrust laws, S.D. Codified Laws § 37-1-3.1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and monopolization or attempted monopolization of trade or commerce, *id.* § 37-1-3.2.

193.    Defendants' conduct and practices have substantial anticompetitive effects in South Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

194.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that South Dakota's antitrust laws were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 24: Tennessee Trade Practices Act

195.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

39

196.     Defendants' acts and practices detailed above violate the Tennessee Trade Practices Act, Tenn. Code § 47-25-101, *et seq.*, which prohibits, *inter alia*, combinations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, *id.*

197.     Defendants' conduct and practices have substantial anticompetitive effect in Tennessee, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

198.     Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Tennessee Trade Practices Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

### Count 25: Utah Antitrust Act

199.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

200.     Defendants' acts and practices detailed above violate the Utah Antitrust Act, Utah Code § 76-10-3101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 76-10-3104, and monopolization or attempted monopolization of any part of trade or commerce, *id.*

201.     Defendants' conduct and practices have substantial anticompetitive effect in Utah, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

202.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the Utah Antitrust Act was intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

**Count 26: Vermont Consumer Protection Laws**

203.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

204.    Defendants' acts and practices detailed above violate Vermont's consumer protection laws, Vt. Stat. tit. 9, § 2451, *et seq.*, which prohibit, *inter alia*, all unfair methods of competition in commerce, *id.* § 2453.

205.    Defendants' conduct and practices have substantial anticompetitive effects in Vermont, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

206.    Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that the Vermont consumer protection laws were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

**Count 27: Wisconsin Trade Regulations**

207.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

41

208.     Defendants' acts and practices detailed above violate Wisconsin's trade regulations, Wis. Stat. Ann. § 133.01, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 133.03, and monopolization or attempted monopolization of any part of trade or commerce, *id.*

209.     Defendants' conduct and practices have substantial effects in Wisconsin, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

210.     Plaintiff was harmed by Defendants' anti-competitive conduct in a manner that Wisconsin's trade regulations were intended to prevent when he paid more for Crop Inputs than he would have paid in a competitive market. Plaintiff has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues.

## PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A.     That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel;

B.     That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and §10/1 of the Illinois Antitrust Act;

C.     That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      That the Court award Plaintiff and the Class damages against Defendants for their violation of federal and state antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

F.      That the Court award Plaintiff and the Class prejudgment interest at the maximum rate allowable by law; and

G.      That the Court direct such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: January 13, 2021          Respectfully submitted,

/s/ Shannon M. McNulty_____

*One of the attorneys for Plaintiff and the Class*
Robert A. Clifford
Shannon M. McNulty
**CLIFFORD LAW OFFICES, P.C.**
120 North LaSalle, #3100
Chicago, Illinois 60602
312-899-9090
rac@cliffordlaw.com
smm@cliffordlaw.com

Linda P. Nussbaum (*pro hac vice* forthcoming)
Bart D. Cohen (*pro hac vice* forthcoming)
Christopher B. Sanchez (Ill. Bar No. 6272989)
Louis Kessler (Ill. Bar No. 6277776)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
csanchez@nussbaumpc.com
lkessler@nussbaumpc.com

Arthur N. Bailey
Marco Cercone
RUPP BAASE PFALZGRAF CUNNINGHAM LLC
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
(716) 854-3400
bailey@ruppbaase.com
cercone@ruppbaase.com

*Counsel for Plaintiff and the Proposed Class*

44